Philip Gordon ISBN 1996
Bruce S. Bistline ISBN 1988
GORDON LAW OFFICES
623 West Hays Street
Boise, ID  83702
Telephone:  208/345-7100
208/345-0050 (fax)

Attorneys for Plaintiff

[Additional counsel appear on signature page.]


## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

---

| | |
|---|---|
| CITY OF ROSEVILLE EMPLOYEES' RETIREMENT SYSTEM, On Behalf of Itself and All Others Similarly Situated, ) ) ) | No. |
| ) | CLASS ACTION |
| Plaintiff, ) ) ) | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| vs. ) ) | |
| MICHAEL W. SADLER, WILBUR G. STOVER, JR., STEVEN R. APPLETON and MICRON TECHNOLOGY, INC., ) ) ) ) | |
| Defendants. ) ) | DEMAND FOR JURY TRIAL |

---

## INTRODUCTION

1.     This is an action on behalf of purchasers of Micron Technology, Inc.

("Micron" or the "Company") publicly traded securities during the period from February

24, 2001 to February 13, 2003 (the "Class Period"), seeking to pursue remedies under the

Securities Exchange Act of 1934 (the "Exchange Act").

2.     Micron manufactures and markets semiconductor devices worldwide. The Company's products include a series of dynamic random access memory products, which provide data storage and retrieval.  Micron's products are used in various electronic applications, including personal computers, workstations, network servers, mobile phones, flash memory cards, USB storage devices, digital still cameras, MP3 players, and other consumer electronics products.  The Company offers its products to original equipment manufacturers through direct sales force, independent sales representatives, distributors, and its Web-based customer direct sales division.

3.     Unbeknownst to investors, at the start of the Class Period Micron and its employees (along with others in its industry) were engaged in a scheme to manipulate the price of dynamic random access memory, a type of computer memory semiconductor chip, commonly known as DRAM.  During 2001, the PC market was shrinking, but prices for DRAM and double data rate DRAM – the type of memory found in the vast majority of PCs – were skyrocketing.  Some types of memory tripled in price in a few months.  In a coordinated effort, Micron and other DRAM manufacturers illegally conspired to raise DRAM prices by intentionally increasing the prices they charged DRAM customers and reaching a consensus amongst the DRAM manufacturers to maintain those high prices.

4.     In June of 2002, the U.S. Federal Trade Commission ("FTC") charged Los Altos, California-based Rambus, Inc. ("Rambus") with violating federal antitrust laws by "deliberately engaging in a pattern of anti-competitive acts and practices that served to deceive an industry-wide standard-setting organization, specifically, not disclosing that it was in the process of seeking patents related to the proposed standards."  The FTC

charged that by its silence while a member of a chip industry standards-setting body, Rambus tricked the other DRAM makers into including technology for which it had filed patents into specifications for DRAM standards.

5.     Once that standard was adopted, Rambus made moves to either collect on royalties or sue those companies that refused to comply, which included other DRAM industry companies such as Infineon, Samsung, Hitachi, Hyundai, and Micron.  It has since been revealed that Micron, along with its co-conspirators, engaged in a retaliatory price-fixing scheme but would deny their complicity in the DRAM price-fixing scheme throughout the Class Period.

6.     The U.S. Department of Justice ("DOJ") issued a federal grand jury subpoena to Micron in June of 2002 demanding any documents relating to contacts and communications between DRAM manufacturers regarding any discussions relating to pricing and sales of DRAM chips.   In an effort to continue concealing Micron's complicity and defendants' misconduct – while publicly claiming that the Company was instead cooperating with the government's investigation – Micron and its employees altered handwritten notes and withheld notes pertaining to phone calls among Micron sales managers that concerned the price of DRAM chips from Micron's competitors.

7.     In September 2004, Micron competitor Infineon finally admitted that it conspired to fix prices in the DRAM industry.  Infineon's $160 million fine, then the third largest criminal fine in the history of the DOJ's Antitrust Division, arose out of a one count charge for violating the Sherman Antitrust Act by conspiring with other DRAM manufacturers between July 1999 and June 2002 to fix prices on DRAM sold to computer and server vendors.

8.      In November 2004, Micron itself disclosed that it had earlier been forced to enter into a secret amnesty agreement with the DOJ to avoid prosecution in the government's price-fixing investigation.  Such programs offer amnesty to a complicit company if it voluntarily reports illegal antitrust activities before an investigation has begun, or if it is the first company to come forward when an illegal activity is first reported.  With this disclosure, defendant Steven R. Appleton ("Appleton"), Micron's Chairman and Chief Executive Officer, was finally forced to publicly denounce his earlier statements that it was "not possible to control prices in this industry" and that the DOJ's investigation was merely "theoretical," admitting that "neither [was] the case." Instead, Appleton was forced to admit that the "DOJ's investigation revealed evidence of price fixing by Micron employees and its competitors on DRAM sold to certain computer and server manufacturers."

9.      During the Class Period, defendants falsified the Company's public statements and financial reporting by concealing the following material adverse facts from the investing public:

(a)     That Micron and its co-conspirators had entered into and engaged in a combination and conspiracy in the United States and elsewhere to suppress and eliminate competition by fixing the prices of DRAM to be sold to certain original equipment manufacturers ("OEMs") of personal computers and servers.

(b)     That the combination and conspiracy engaged in by Micron and its co-conspirators had been an unreasonable restraint of interstate and foreign trade and commerce in violation of §1 of the Sherman Act (15 U.S.C. §1).

(c)     That the combination and conspiracy Micron participated in

consisted of a continuing agreement, understanding, and concert of action among Micron and its co-conspirators, the substantial terms of which were to agree to fix the prices for DRAM to be sold to certain OEMs.

(d)     That for the purpose of forming and carrying out the charged combination and conspiracy, Micron and its co-conspirators did those things that they combined and conspired to do, including, among other things:

(i) participating   in   meetings,   conversations   and communications in the United States and elsewhere to discuss the prices of DRAM to be sold to certain OEMs;

(ii) agreeing,   during   those   meetings,   conversations,   and communications to charge prices for DRAM at certain levels to be sold to certain OEMs;

(iii)        issuing price quotations in accordance with the agreements reached; and

(iv) exchanging information on sales of DRAM to certain OEM customers for the purpose of monitoring and enforcing adherence to the agreed-upon prices and artificially inflating the Company's revenue and profits.

(e)     That Micron's s publicly reported sales and earnings had been improperly inflated due to illegal price-fixing activities during the Class Period.

(f)     That as a result of defendants' participation in the illegal price-fixing activities, Micron's sales and earnings reports and forward-looking price forecasts issued during the Class Period were false and misleading.

10.     As a result of defendants' false and misleading Class Period statements, the Company's shares traded at inflated prices enabling the Company to issue more than

$632 million worth of debt during 2003, sell over $480 million worth of warrants and complete numerous stock-for-stock acquisitions using the Company's inflated shares as acquisition currency. Insiders also sold approximately $4.5 million worth of their own personally held Micron stock at inflated prices during the Class Period.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act (15 U.S.C. §78aa).

13.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts alleged herein occurred and/or are occurring in substantial part in this District.

14.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

15.     Plaintiff City of Roseville Employees' Retirement System purchased Micron publicly traded securities as detailed in the attached Certification and was damaged thereby.  Plaintiff is a public employee pension fund located in Roseville, Michigan.

16.     Defendant Micron engages in the manufacture and marketing of

semiconductor devices worldwide.  Micron's principal place of business is located at 8000 S. Federal Way, Boise, Idaho.  Micron has approximately 617 million shares issued and outstanding.

17.    Defendant Michael W. Sadler ("Sadler") is, and was at all relevant times, Micron's Vice President of Worldwide Sales.  During the Class Period Sadler sold approximately 22,000 shares of Micron stock at inflated prices receiving approximately $936,000 in proceeds.

18.    Defendant Steven R. Appleton ("Appleton") is, and was at all relevant times, Chairman, President and Chief Executive Officer for the Company.

19.    Defendant Wilbur G. Stover, Jr. ("Stover") is, and was at all relevant times, Chief Financial Officer, Principal Accounting Officer and Vice President of Finance for the Company.  During the Class Period Stover sold approximately 110,000 shares of Micron stock at inflated prices receiving approximately $3.6 million in proceeds.

20.    Defendants Appleton, Stover and Sadler are the "Individual Defendants." They are liable for the false statements pleaded in ¶¶17-19, as those statements were "group-published" information.

ILLEGAL ANTITRUST ACTIVITIES

21.    By 1998, approximately 90% of semiconductor sales were memory chips for PCs and the industry was cyclical and volatile.  Seeking a bigger position in this lucrative industry, in 1998 Appleton expended $800 million of Micron's common stock, a 10% stake at the time, to buy out Texas Instruments' then money-losing memory unit. Appleton's move was seen as risky but smart, coming just when the DRAM industry was

reeling from one of its periodic sales slumps.  On the heels of that acquisition, Appleton arranged an equity-for-cash financing from Intel that gave Micron $500 million in exchange for ensuring Intel would have access to the memory chips it needed for its microprocessors.  ***Micron's DRAM market share – a very erratic market – increased from 7% to 22% overnight.***

22.     Rambus was a small firm that owned – or claimed to own – critical technology for speeding up the retrieval of bits from memory chips.  Micron and others in the DRAM industry resented paying royalties to Rambus for use of this technology – which cut deeply into profits – and accused Rambus of illegally obtaining the intellectual "rights" it now claimed, arguing they were improperly derived from Rambus' earlier involvement in an industry standards-setting group.

23.     On August 28, 2000, Micron filed a lawsuit against Rambus alleging violations of federal antitrust laws, and invalidity, non-infringement and non-enforceability of certain Rambus patents.  Hyundai Electronics ("Hyundai") filed a lawsuit seeking a court order to declare that their products did not infringe on certain patents owned by Rambus on August 29, 2000.  Thereafter, in September 2000, Rambus filed patent infringement suits in Germany and France against Hyundai and Micron, and also asked the U.S. International Trade Commission to investigate what it deemed "unlawful importation" of memory products which Rambus said were covered by its patents.  Those lawsuits sought to halt the sale, manufacture and use of Micron and Hyundai memory devices which Rambus said infringed upon a Rambus European patent.

24.     An unintended consequence of Rambus' aggressiveness was the development of meaningful networks and a coordinated response by others in the DRAM

industry.  Defendants began conspiring with others in the DRAM industry to set prices to prevent the cyclical price declines that made the royalties being demanded by Rambus unfathomable.

25.    In order to stabilize revenues and earnings beginning by at least 1999 and continuing until at least 2002, defendants, along with others in the DRAM industry, engaged in a continuing agreement, understanding and conspiracy in restraint of trade to artificially raise, fix, maintain or stabilize prices for computer memory products in the United States in violation of §1 of the Sherman Act, 15 U.S.C. §1, and federal securities laws in turn.

26.    The defendants sought to and did fix, raise and maintain, or stabilize prices for computer memory products in the United States.

27.    In formulating and effectuating the aforesaid contract, combination or conspiracy, Micron and its co-conspirators did those things that they combined and conspired to do, including, among other things:

(a)    participated in meetings, conversations and communications in the United States and elsewhere to discuss the prices of DRAM to be sold to certain OEMs;

(b)    agreed, during those meetings, conversations, and communications to charge prices for DRAM at certain levels to be sold to certain OEMs;

(c)    issued price quotations in accordance with the agreements reached; and

(d)    exchanged information on sales of DRAM to certain OEM customers for the purpose of monitoring and enforcing adherence to the agreed-upon prices and artificially inflating the Company's revenue and profits.

28.     Throughout the Class Period, defendants affirmatively and fraudulently concealed this unlawful conduct from plaintiff and the Class.

29.     Defendants' illegal activities had their intended effect and for the fiscal year ending August 31, 2000 – despite the shrinking PC industry – the Company posted a banner year, reporting $1.5 billion in earnings on sales of $7.3 billion after two consecutive annual losses.

30.     Reporting the Company's 1Q 01 interim financial results on December 20, 2000, Appleton acknowledged declining DRAM prices and increasing inventory levels, but stated he was "very pleased with the Company's performance," commenting that "[d]espite declining market conditions, Micron had a ***very strong quarter***" and added that Micron was ***"well positioned with leading edge process technology, low-cost manufacturing expertise and strong financials."***  These positive but false statements, coupled with those issued during the Company's earnings conference later that day, remain fresh in the market and uncorrected at the start of the Class Period on February 24, 2001.

FALSE AND MISLEADING STATEMENTS
DURING THE CLASS PERIOD

31.     On March 29, 2001, the Company issued a press release entitled "Micron Technology, Inc. Reports Consolidated Results for Second Quarter of Fiscal 2001."  The release stated in relevant part:

> Micron Technology, Inc., today confirmed its March 21, 2001, announcement that the pretax results of its Semiconductor Operations were slightly profitable for the second fiscal quarter ended March 1, 2001 on net sales of $1,051 million. The Company's consolidated net loss for the second quarter of fiscal 2001 was $88 million (or $0.15 per diluted share) which includes the effects of the net loss from the Micron

Electronics, Inc. (MEI), discontinued PC operations of $84 million (or $0.14 per diluted share) and the net loss from MEI's continuing Web hosting operation. The Company's consolidated financial information presents the net effect of discontinued operations separate from the results of the Company's continuing operations. Historical financial information of the Company has been restated to present consistently the discontinued operations.

The Company's loss from continuing operations, net of taxes, for the second quarter of fiscal 2001 was $4 million (or $0.01 per diluted share) on consolidated net sales of $1,066 million. Income from continuing operations, net of taxes, for the first quarter of fiscal 2001 was $359 million (or $0.59 per diluted share) on net sales of $1,572 million.

Net sales from the Company's Semiconductor Operations decreased approximately 33% in the second quarter of fiscal 2001 compared to the immediately preceding quarter primarily due to the effect of an approximate 50% decrease in average selling prices for the Company's semiconductor memory products, partially offset by an approximate 33% increase in megabits shipped. Gross margin on sales of semiconductor products decreased to 18% for the second quarter of fiscal 2001 from 49% for the first quarter, primarily reflecting the lower average selling prices for the Company's semiconductor memory products. Net sales from the Semiconductor Operations for the first quarter of fiscal 2001 were $1,558 million.

32.     On June 21, 2001, the Company issued a press release entitled "Micron Technology, Inc., Reports Consolidated Results for Third Fiscal Quarter 2001."   The release stated in part:

Micron Technology, Inc., today announced an after-tax net loss from continuing operations for the third quarter of $301 million, or $0.50 per diluted share, on $818 million of net sales.  The third quarter loss from continuing operations includes a pre-tax inventory write down of approximately $260 million.  For the first nine months of fiscal 2001, the Company reported net income from continuing operations of $54 million, or $0.09 per diluted share, on $3,456 million of net sales.

Net sales from the Company's semiconductor operations for the third quarter of fiscal 2001 decreased 24% compared to the immediately preceding quarter as a result of an approximate 35% decline in the Company's overall average selling price per megabit, partially offset by an approximate 20% increase in megabit shipments.  The Company's

aggregate work in process and finished goods inventories, as measured in megabits, were considerably higher at the end of the third quarter, principally due to the acquisition of the KMT wafer fab.

33.    On September 25, 2001, the Company issued a press release entitled

"Micron Technology, Inc., Reports Consolidated Results for Fourth Quarter and Fiscal

Year 2001."  The release stated in part:

> Micron Technology, Inc., today announced a net loss for the fourth quarter of fiscal 2001 of $576 million, or $0.96 per diluted share, on $480 million of net sales.  For the fiscal year ended August 30, 2001, the Company had a net loss from continuing operations of $521 million, or $0.88 per diluted share, on $3,936 million of net sales.  For fiscal year 2000, the Company had net income from continuing operations of $1,548 million, or $2.63 per diluted share, on net sales of $6,362 million.
>
> In the fourth quarter of fiscal 2001, the Company recorded an aggregate charge of $191 million ($118 million, or $0.20 per diluted share, net of taxes) for the write-down of its equity investment in Interland, Inc. (formerly Micron Electronics, Inc.), and subsequent contribution of its Interland shares to the Micron Technology Foundation. In addition, the loss for the fourth quarter includes the effect of a write-down of work in process and finished goods inventories of $466 million ($289 million, or $0.48 per diluted share, net of taxes) to reduce the carrying value of inventories to their lower of cost or market value.
>
> Average selling prices for the Company's semiconductor memory products in the fourth quarter of fiscal 2001 decreased approximately 55% compared to the third quarter and decreased approximately 85% compared to the fourth quarter of the prior year.  This precipitous drop in average selling prices led to a 79% drop in the Company's net sales when comparing the fourth quarter of fiscal 2001 to the fourth quarter of fiscal 2000.  The effect of the lower average selling prices on the Company's net sales for the fourth quarter of fiscal 2001 was partially offset by a higher level of megabit shipments.  Megabit shipments in the fourth quarter of fiscal 2001 increased approximately 30% compared to the third quarter and approximately 45% compared to the fourth quarter of the prior year. The Company's megabit shipments for fiscal year 2001 increased approximately 50% compared to fiscal 2000.  Megabit inventories in work in process and finished goods increased slightly in the fourth quarter compared to the third quarter of fiscal 2001.
>
> "The global economy is facing stiff challenges from which our

industry is certainly not exempt," said Steve Appleton, Micron's Chief Executive Officer.  "However, ***Micron is poised with one of the strongest balance sheets in the industry, an excellent complement of people resources, an industry leading process technology and a resolve to emerge from these troubled times as the strongest semiconductor memory manufacturer in the world.   Our manufacturing implementation of 0.13μ process technology should position us very positively for 2002.***"

34.     On December 18, 2001, the Company issued a press release entitled "Micron Technology, Inc., Reports Consolidated Results for First Quarter 2002."  The release stated in part:

> Micron Technology, Inc., today announced a net loss for the first quarter of fiscal 2002 of $266 million, or $0.44 per diluted share, on $424 million of net sales. These results compare to a net loss of $576 million, or $0.96 per diluted share, on $480 million of net sales for the fourth quarter of fiscal 2001 and income from continuing operations of $360 million, or $0.59 per diluted share, on $1,572 million of net sales for the first quarter a year ago.
>
>      . . . Average selling prices for the Company's semiconductor memory products for the first quarter of fiscal 2002 decreased 24% when compared to the preceding quarter and decreased 88% when compared to the first quarter a year ago. Megabit shipments in the first quarter of fiscal 2002 increased approximately 20% compared to the immediately preceding quarter and approximately 130% compared to the first quarter of the prior year. Megabit inventories in work in process and finished goods decreased approximately 20% at the end of the first quarter of fiscal 2002 compared to their levels at the end of the fourth quarter of fiscal 2001.

35.     On March 21, 2002, the Company issued a press release entitled "Micron Technology, Inc., Reports Consolidated Results for the Second Quarter of Fiscal Year 2002."  The release stated in part:

> Micron Technology, Inc., today announced a net loss for the second quarter of fiscal 2002 of $30 million, or $0.05 per diluted share, on net sales of $646 million. These results compare to a net loss of $266 million, or $0.44 per diluted share, on net sales of $424 million for the first quarter of fiscal 2002 and a net loss from continuing operations of $4 million, or

$0.01 per diluted share, on net sales of $1,066 million for the second quarter of fiscal 2001.

Net sales in the second quarter of fiscal 2002 were 52% higher compared to the first quarter of fiscal 2002 as a result of an approximate 70% increase in average selling prices for the Company's products, partially offset by an approximate 10% decrease in megabit shipments. The Company's finished goods inventories declined significantly during the quarter, and reached minimum levels at quarter end. Megabit production in the second quarter of fiscal 2002 was approximately 30% lower than the first quarter, attributable to the Company's efforts to reduce its manufacturing cycle times and the effects of scheduled holiday downtime.

36.     On June 25, 2002, the Company issued a press release entitled "Micron Technology, Inc., Reports Consolidated Results for the Third Quarter of Fiscal Year 2002." The release stated in part:

Micron Technology, Inc., today announced a net loss for the third quarter of fiscal 2002 of $24 million, or $0.04 per diluted share, on net sales of $771 million. These results compare to a net loss of $30 million, or $0.05 per diluted share, on net sales of $646 million for the second quarter of fiscal 2002 and a net loss from continuing operations of $301 million, or $0.50 per diluted share, on net sales of $818 million for the third quarter of fiscal 2001.

Net sales in the third quarter of fiscal 2002 were 19% higher compared to the immediately preceding quarter ended February 28, 2002 due to 44% higher average selling prices. Although average selling prices were higher for the third quarter of fiscal 2002, prices declined from early April through the end of the quarter due to adverse market conditions. Megabits sold by the Company in the third quarter of fiscal 2002 were 17% lower than in the second quarter, and megabits of finished goods inventories increased significantly as compared to the end of the second quarter.

37.     On September 24, 2002, the Company issued a press release entitled "Micron Technology, Inc., Reports Results for the Fourth Quarter and Fiscal Year 2002." The release stated in part:

Micron Technology, Inc., today announced results of operations for its

fourth quarter and fiscal year ended August 29, 2002, with operating losses of $468 million and $1,025 million, respectively, on net sales of $748 million and $2,589 million, respectively. Operating results for the fourth quarter of fiscal 2002 include a write-down of $174 million to record inventories of semiconductor products at their estimated market values.

Average selling prices for the Company's semiconductor products decreased approximately 30% in the fourth quarter compared to the immediately preceding quarter ended May 30, 2002. The decrease in average selling prices was substantially offset by an approximate 40% increase in the Company's megabit shipments during the fourth quarter resulting in only slightly lower net sales for the fourth quarter compared to the third quarter.

Despite adverse market conditions, ***the Company is executing successfully with respect to its products and technology***. In the fourth quarter the Company completed its transition from the 256 Meg Sync DRAM to the 256 Meg DDR DRAM as its primary product. Finished goods inventory levels of DDR products are minimal as ***demand for DDR memory remains strong***.

38.   On December 17, 2002, the Company issued a press release entitled

"Micron Technology, Inc., Reports Results for the First Quarter of Fiscal Year 2003."

The release stated in part:

Micron Technology, Inc., today announced results of operations for the first quarter of its 2003 fiscal year which ended November 28, 2002. The Company recognized an operating loss for the first quarter of fiscal 2003 of $297 million and a net loss of $316 million, or $0.52 per diluted share, on sales of $685 million. These results compare to an operating loss of $468 million on sales of $748 million for the immediately preceding quarter and an operating loss of $452 million on sales of $424 million for the first quarter of fiscal 2002. These operating results include charges for write-downs of inventories to their estimated market values of $91 million for the first quarter of fiscal 2003, $174 million for the fourth quarter of fiscal 2002 and $173 million for the first quarter of fiscal 2002. Absent the effect of the first quarter of fiscal 2003 write-down and the effects of previous write-downs of products sold in the first quarter, the Company's operating loss for the first quarter of fiscal 2003 would have been $345 million.

Average selling prices per megabit for the Company's

semiconductor products decreased approximately 12% in the first quarter compared to the immediately preceding quarter ended August 29, 2002, principally as a result of lower selling prices for the Company's synchronous DRAM products partially offset by higher selling prices for DDR products. Megabit sales volumes were modestly higher comparing the first quarter to the immediately preceding quarter. Synchronous DRAM products constituted approximately 60% of the first quarter sales as measured in megabits, as demand allowed the Company to reduce inventories of these devices. The Company's production in the first quarter was slightly more than 50% DDR memory.

LOSS CAUSATION/ECONOMIC LOSS

39.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Micron's stock price and operated as a fraud or deceit on Class Period purchasers of Micron stock by misrepresenting the Company's business success and future business prospects. Defendants achieved this façade of success, growth and strong future business prospects by blatantly misrepresenting the Company's business prospects.  Later, however, when defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, Micron stock fell precipitously as the prior artificial inflation came out of Micron's stock price.  As a result of their purchases of Micron stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

FIRST CLAIM FOR RELIEF

**For Violation of §10(b) of the Exchange Act
and Rule 10b-5 Against All Defendants**

40.     Plaintiff incorporates ¶¶1-39 by reference.

41.     During the Class Period, defendants disseminated or approved the false

statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

42.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Micron publicly traded securities during the Class Period.

43.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Micron publicly traded securities.  Plaintiff and the Class would not have purchased Micron publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

44.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Micron publicly traded securities during the Class Period.

SECOND CLAIM FOR RELIEF

**For Violation of §20(a) of the Exchange Act
Against All Defendants**

45.     Plaintiff incorporates ¶¶1-44 by reference.

46.     The executive officers of Micron prepared, or were responsible for preparing, the Company's press releases and SEC filings.  The Individual Defendants controlled other employees of Micron.  Micron controlled the Individual Defendants and each of its officers, executives and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

CLASS ACTION ALLEGATIONS

47.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Micron publicly traded securities on the open market during the Class Period (the "Class").  Excluded from the Class are defendants, directors and officers of Micron and their families and affiliates.

48.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During the Class Period, Micron had more than 617 million shares outstanding, owned by thousands of persons.

49.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the Exchange Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

1.     declaring this action to be a proper class action;

2.     awarding damages, including interest to the plaintiff and the members of the class;

3.     awarding reasonable costs, including attorneys' fees to the plaintiff and the members of the class; and

4.     for such equitable, injunctive or other relief as the Court may deem proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  February 24th, 2006                    GORDON LAW OFFICES

                                                            /s/
                                               _____
                                               Philip Gordon ISBN 1996
                                               Bruce S. Bistline ISBN 1988

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - Page 19

623 West Hays Street
Boise, ID  83702
Telephone:  208/345-7100
208/345-0050 (fax)

LERACH COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
MARY K. BLASY
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

LERACH COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
JOHN K. GRANT
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Micron.doc