IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| )<br>)<br>In re MICRON TECHNOLOGIES,  )<br>INC. SECURITIES LITIGATION.  )<br>)<br>)<br>_____ ) | Case No. CV-06-085-S-BLW<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

## INTRODUCTION

The Court has before it Micron's motion to dismiss and plaintiffs' motion to amend.  The Court heard oral argument on these motions on February 5, 2007, and took the motions under advisement.  For the reasons expressed below, the Court will deny Micron's motion to dismiss and grant plaintiffs' motion to amend.

## FACTUAL BACKGROUND

This § 10(b) class action was filed by Micron shareholders allegedly injured by Micron's participation in an illegal price-fixing conspiracy.[1]  Micron's motion to dismiss alleges in part that this suit is barred by the two-year statute of limitations. *See* 28 U.S.C. § 1658(b).  This suit was filed on February 24, 2006.  To resolve the limitations issue, it is crucial to divide events into those occurring more

---

[1] Plaintiffs have also made a claim under § 20(a) of the Securities Exchange Act.  It provides derivative liability for those who control others found to be primarily liable under the Act.  *In re Ramp Networks, Inc. Sec. Lit.*, 201 F.Supp.2d 1051, 1063 (N.D.Cal.2002).

**Memorandum Decision and Order – Page 1**

than two years before this suit was filed – that is, prior to February 24, 2004 – and events occurring thereafter.

**1.    Events Prior to February 24, 2004**

Micron produced Dynamic Random Access Memory (DRAM) chips for use primarily in computers.  DRAM was Micron's principal product, and thus Micron's stock price tracked closely with the price of DRAM.

In 2001, Micron allegedly entered into a global price-fixing conspiracy to ensure high DRAM prices and high Micron stock prices.  Even though computer demand was down in 2001, the prices for DRAM were rising rapidly.  At the same time, Micron's Vice-President of Worldwide Marketing, Michael Sadler, and other Micron officials, issued public statements attributing high DRAM prices to market forces.

Plaintiffs allege that these statements were false because Micron officials knew it was illegal price-fixing, not market factors, that led to increasing DRAM prices.  Plaintiffs allege that Micron's deception had the desired effect: Micron's stock price increased.

On June 17, 2002, the U.S. Department of Justice (DOJ) issued a federal grand jury subpoena to Micron, seeking documents relating to communications between DRAM manufacturers regarding the pricing and sales of DRAM chips.

**Memorandum Decision and Order – Page 2**

DOJ also issued subpoenas to the other two largest global manufacturers of DRAM, Samsung and Infineon Technologies.

A DOJ spokeswoman refused to provide any details beyond the fact that the DOJ was investigating the computer memory chip industry.  Press accounts included a quote from a "federal official, speaking on condition of anonymity," who "confirmed that the subpoenas were part of an ongoing criminal investigation."  *See Exhibit 14* at p. 2.  Micron publically disclosed the service of the subpoena, and announced that it would cooperate with the DOJ, although it denied that it violated antitrust laws.  *See Exhibit 13.*

On June 21, 2002, the Wall Street Journal reported these events, noting that the investigation "follows a sharp but brief price increase for [DRAM] earlier [in 2002]."  *See Exhibit 19.*  While prior investigations focused on dumping by foreign chip makers, recent exits by some companies reduced competition, "thereby concentrating greater pricing power in the hands of a few large suppliers."  *Id.*  The Journal quoted earlier statements by Dell Computer's CEO, Michael Dell, expressing alarm at the "cartel-like behavior of a couple of DRAM suppliers."  *Id.*  Dell had concluded that the collusion was "successful for a very short period of time."  *Id.*  The article then noted that DRAM prices "shot up to $4.50 each in [the first quarter of 2002] from an average of $1.97 each in the fourth quarter of last

**Memorandum Decision and Order – Page 3**

year." *Id.* Others were not convinced that collusion was behind price movements, and they cited the inherent volatility of the DRAM market as the cause of price swings. *Id.*

By June 24, 2002, the press was reporting "an apparent admission by a Mosel-Vitelic officer of price fixing meetings" between his company, Hynix Semiconductor and Samsung, large DRAM producers. *Exhibit 21.* These reports did not mention Micron.

Within the next three months, sixteen antitrust actions were filed against Micron and other producers. These suits were filed by DRAM purchasers who claimed they were victims of the high prices caused by the price-fixing. The complaints allege that in the fall of 2001, Micron and the other defendants entered into a secret agreement to reduce supply by 20%, resulting in price hikes. *See Exhibit 40.* However, the complaints cite no evidence in support of these allegations.

By October 30, 2002, there were twenty-three such suits. While Micron's stock price was $48.83 per share in March of 2001, it had dropped to $6.76 by the close of the class period, February 13, 2003.

By February 10, 2003, the press was reporting "unconfirmed reports that Micron . . . was preparing to admit anti-competitive practices . . . ." *See Exhibit 25.*

**Memorandum Decision and Order – Page 4**

That same article stated that a former Micron sales manager had agreed to plead guilty to "obstructing the [DOJ] investigation by altering and concealing documents that contained information about the pricing of competitors' pricing." *Id*.

On December 17, 2003, the DOJ issued a press release revealing in detail the Micron manager's obstruction of justice. *See Exhibit 26*. The manager, Alfred Censullo, altered his notes of conferences with other Micron managers concerning, among other things, "prices at which competing DRAM suppliers would sell their products to major [computer makers] in upcoming price negotiations." *Id*. He also concealed 14 pages "from his notebooks that contained competitor pricing information and obvious alterations . . . ." *Id.* His purpose was "to disguise the nature, source, and accuracy of information . . . concerning contacts and communications between DRAM suppliers relating to the pricing and sale of DRAM." *Id.*

On December 31, 2003, the *Los Angeles Times* reported that at a Federal Trade Commission (FTC) trial earlier that year, chip-maker Rambus Inc. "presented evidence that chip makers including Micron conspired to fix prices." *See Exhibit 29*. No further detail was provided on the nature of this evidence.

The "evidence" referred to in this article was publically available at the FTC

before December 31, 2003.  Investors led by the *Los Angeles Times* article to

examine the FTC public record would have discovered proposed Findings of Fact

and Conclusions of Law, prepared by Rambus, that summarized the evidence

submitted by Rambus in the FTC trial.  *See Exhibit 43.*  These Findings are dated

September 8, 2003.  *See Affidavit of Greene* at p. 3; *Appendix A to Motion to

Dismiss* at p. 9.

　　This evidence included an e-mail from Micron manager Kathy Radford

dated November 26, 2001.  *Id.*  Rambus summarizes part of that e-mail by stating

in its Findings that Radford "described the efforts of Infineon and Samsung to raise

DDR prices, and stated that Micron intended to try to raise its prices to all of the

OEM [original equipment manufacturers]."  *Id.*  Rambus then quotes from the e-

mail wherein Radford reported that "the consensus from all suppliers is that if

Micron makes the move, all of them will do the same and make it stick."  *Id.*

**2.**　　**Events Occurring After February 24, 2004**

　　On February 26, 2004, an article in the *Wall Street Journal Europe*

discussed in detail the Radford e-mail.  *See Exhibit 1 to Plaintiffs' Response Brief*.

On September 15, 2004, Infineon Technologies pled guilty to criminal charges of

illegal DRAM price-fixing between 1999 and 2002.

　　On November 11, 2004, Micron's CEO Steve Appleton publically admitted

**Memorandum Decision and Order – Page 6**

for the first time that the DOJ investigation revealed evidence of DRAM price-fixing by Micron employees and its competitors.  Two days later, the Idaho Statesman newspaper published an article revealing that Micron had signed an agreement with DOJ whereby Micron would participate in the DOJ's Corporate Leniency Policy, which provides that in exchange for Micron's full cooperation, it would not be subject to any prosecution or penalty.

## ANALYSIS

### 1.    Standard of Review - General

Micron brings its motion to dismiss under Rule 12(b)(6), but submits material outside the pleadings.  This converts the motion to one under Rule 56 for summary judgment.  *See* Rule 12(b).  The plaintiffs have not objected to the submission of extrinsic documents, or requested time to do additional discovery, but have instead submitted extrinsic documents of their own.  Accordingly, the Court will treat the motion as one for summary judgment under Rule 56, and determine whether there exist any genuine issues of material fact.

Micron bears the initial burden to demonstrate the absence of any genuine issue of material fact.  *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).  Once Micron does so, the burden shifts to plaintiffs to set forth, by affidavit or as otherwise provided in Rule 56, specific

facts showing that there is a genuine issue for trial.  *See* Rule 56(e).  This Court

must not weigh the evidence or pass on the credibility of witnesses but is instead

limited to determining whether there is any genuine issue for trial.  *See*

*Abdul-Jabbar v. Gen. Motors Corp*., 85 F.3d 407, 410 (9th Cir.1996).

**2.      Standard of Review – Statute of Limitations Issues**

A defendant raising the statute of limitations as an affirmative defense has

the burden of proving that the action is time-barred.  *See California Sansome Co. v.*

*U.S. Gypsum*, 55 F.3d 1402, 1406 (9th Cir. 1995).  When the issue turns on when a

reasonable person should have discovered certain facts for statute of limitations

purposes, the question is one of fact, generally for a jury to resolve.  *Nevada Power*

*Co. v. Monsanto Co.*, 955 F.2d 1304, 1307 (9th Cir. 1992).  However, where

uncontroverted evidence irrefutably proves the plaintiffs knew or should have

known of the conduct, the time of discovery may be decided as a matter of law.

*Flowers v. Carville*, 292 F.Supp.2d 1225 (D.Nev. 2003).  This has been described

as an "extremely difficult burden . . . ."  *Nevada Power*, 955 F.3d at 1308.  Micron

is therefore entitled to summary judgment only if uncontroverted evidence

establishes that the two-year limitations period began running before February 24,

2004, an extremely difficult burden to satisfy.

**Memorandum Decision and Order – Page 8**

3.    **Section 10(b) Statute of Limitations**

The Ninth Circuit has considered, without resolving, whether § 10(b)'s limitations period begins with actual or inquiry notice. *Berry v. Valence Technology, Inc.*, 175 F.3d 699, 704 (9th Cir.1999). In *Berry*, the Circuit declined to adopt either standard, but stated that "[i]f we were to adopt inquiry notice, we would agree with the Tenth Circuit's formulation of that standard [in *Sterlin v. Biomune Sys.,* 154 F.3d 1191 (10th Cir. 1998)]."

This standard asks two questions: (1) Would a reasonable investor have been on inquiry notice?; and (2) If so, when should a reasonable investor have discovered the facts sufficient to meet the pleading standards for bringing a § 10(b) action?

With regard to the first question, inquiry notice exists when circumstances "raise sufficient suspicion of fraud to cause a reasonable investor to investigate the matter further." *Berry*, 175 F.3d at 704. While the facts need not provide investors "with full knowledge of the fraud," they must be "sufficient to excite inquiry into the possibility of fraudulent conduct." *Id*. at 705. The plaintiff "need not . . . have fully discovered the nature and extent of the fraud before [he was] on notice that something may have been amiss. Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself." *Sterlin*, 154 F.3d at

1203.  To determine if plaintiffs are on inquiry notice, the Court examines

> any financial, legal, or other data, such as public disclosures in the media
> about the financial condition of the corporation and other lawsuits
> alleging fraud committed by the defendants, that provide the plaintiff
> with sufficient storm warnings to alert a reasonable person to the
> probability that there were either misleading statements or significant
> omissions involved in the sale of securities.

*In re Infonet Services Corp. Securities Litigation*, 310 F.Supp.2d 1106, 1113-14

(C.D.Cal. 2003).

If the answer to that first question is yes – and the investor is on inquiry

notice – the answer to the second question determines when the period begins to

run: "[W]hen should a reasonably diligent investor have discovered the facts

underlying the alleged fraudulent activity?"  *Id.*  In answering this question, "[a]

reasonable investor is presumed to have information available in the public

domain, and therefore . . . is imputed with constructive knowledge of this

information."  *Berry*, 175 F.3d at 703, n. 4.

This second question fosters fairness for plaintiffs who are on inquiry notice

but "could not reasonably have discovered within [two years] sufficient facts to file

a suit which satisfied the particularized pleading requirements" of the securities

laws.  *Sterlin*, 154 F.3d at 1203.  The source of those strict rules is the  Private

Securities Litigation Reform Act of 1995 (PSLRA).  The PSLRA requires

plaintiffs suing under § 10(b) to "plead in great detail" their allegations.  *In re*

**Memorandum Decision and Order – Page 10**

*Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 974 (9th Cir. 1999). Given the heightened pleading standard imposed by the PSLRA, it is only fair to delay the start of the limitations period until an investor, exercising reasonable diligence, should have discovered sufficient facts to satisfy those standards.

To quantify the critical mass of facts needed to satisfy those standards, the Court will review the PSLRA pleading requirements and the elements of a § 10(b) action.  To state a claim under § 10(b), plaintiffs must allege: (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which plaintiffs relied (5) which proximately caused their injury.  *See DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385 (9th Cir. 2002).  The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that [Micron] acted with [scienter]." 15 U.S.C. § 78u-4(b)(2).

"The proof of scienter in fraud cases is often a matter of inference from circumstantial evidence."  *In re Software Toolworks Inc*., 50 F.3d 615, 628 (9th Cir.1994).  Thus, plaintiffs need not have direct proof of fraud to meet the PSLRA pleading requirements, but plaintiffs must "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics Inc. Securities Litigation,* 183 F.3d 970 (9th Cir. 1999).  Recklessness is:

**Memorandum Decision and Order – Page 11**

a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir.1990) (quotations omitted).  To allege a "strong inference of deliberate recklessness," plaintiffs "must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity."  *Silicon Graphics*, 183 F.3d at 974.

The PSLRA sets a strict standard because "Congress intended for complaints under [§ 10(b)] to stand or fall based on the actual knowledge of the plaintiffs rather than information produced by the defendants after the action has been filed." *In re Daou Systems, Inc.,* 411 F.3d 1006, 1021 (9th Cir. 2005), *cert. denied,* 126 S. Ct. 1335 (2006) (quoting *Medhekar v. United States Dist. Ct.*, 99 F.3d 325, 328 (9th Cir.1996)).[2]  *Daou* bases this holding on a provision of the PSLRA, 15 U.S.C. § 78u-4(b)(1).[3]

---

[2]   As noted earlier, plaintiffs have also brought a claim under § 20(a) of the Securities Exchange Act based on the underlying § 10(b) claim.  In this case, the pleading requirements for both violations are the same.  *In re Gilead Sciences Securities Litigation*, 2005 WL 181885 (N.D. Cal. 2005).

[3]  That Act requires that all suits based on allegations of material misstatements or omissions under the PSLRA must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

**Memorandum Decision and Order – Page 12**

To summarize all of these standards in the context of this case, the Court must answer the following two questions to resolve *Berry's* inquiry-plus-due-diligence test: (1) Would a reasonable investor in Micron stock be on inquiry notice prior to February 24, 2004, that Micron had committed fraud in connection with the purchase and/or sale of Micron stock?; (2) If so, should an investor, exercising reasonable diligence, have discovered facts giving rise to a strong inference of fraud, sufficient to pass the PSLRA's pleading standards, prior to February 24, 2004?

## 4.     First Issue: Inquiry Notice

To answer *Berry's* first question, the plaintiffs were clearly on inquiry notice before February 24, 2004.  By the end of December, 2003, reasonable Micron investors would have known that (1) they had earlier relied on statements of Micron officials that market forces were the cause of high DRAM prices; (2) that Micron stock prices were directly related to DRAM prices; (3) that Micron and other DRAM manufacturers were under investigation by the DOJ; (4) that press reports included the opinions of market analysts and legal experts that the DOJ was investigating whether there was illegal collusion between Micron and other DRAM manufacturers to fix prices; (5) that Dell Computer's CEO Michael Dell had

accused DRAM manufacturers of "cartel-like behavior" that had led to a short-term price hike; (6) that the Wall Street Journal had reported that the most popular DRAM chips had "shot up" to $4.50 apiece from $1.97 in a short period; (7) that press accounts reported an "apparent admission" by one official of price-fixing meetings between DRAM manufacturers Hynix and Samsung; (8) that 24 civil antitrust suits had been filed alleging that Micron colluded with other DRAM manufacturers to fix DRAM prices; (9) that such collusion might render false Micron's statements that market forces caused high DRAM prices; (10) that Micron stock losses could be related to DRAM price drops which in turn were related to collusive activity (or its cessation); (11) that press reports revealed that a Micron manager had admitted to altering and concealing his notes to disguise the nature of price communications between DRAM suppliers; and (12) that the *Los Angeles Times* had reported that Rambus had introduced evidence to the FTC that Micron had conspired to fix prices.

All of this information would "excite inquiry" by a reasonable investor into whether Micron committed fraud in connection with the purchase or sale of Micron stock. Thus, as a matter of law, plaintiffs were on inquiry notice by December 31, 2003.

**5.    Second Issue: Due Diligence Discovery**

**Memorandum Decision and Order – Page 14**

By itself, inquiry notice does not trigger the limitations period until such time as an investor, exercising reasonable diligence, should have discovered sufficient facts to satisfy the PSLRA's heightened pleading requirements for a § 10(b) action.  This is the issue that is difficult to resolve as a matter of law.

By December 31, 2003, with all the background listed above, a crucial piece of evidence was revealed – the *Los Angeles Times* reported that Rambus had submitted evidence to the FTC that Micron conspired to fix prices.  A summary of that evidence – the Radford e-mail – was then available at the FTC for any diligent investor.

The Rambus litigation was no obscure proceeding.  The *Wall Street Journal* had earlier reported on the litigation in the same article discussing the DOJ's investigation of Micron.  *See Exhibit 19 to Greene Affidavit*.  That article included a web-link to the FTC's complaint against Rambus.  *Id*. at p. 3.

Plaintiffs argue that the Radford e-mail discussion was buried deep in a lawyer-drafted document that was simply a proposed decision, not anything officially entered by the FTC.  While that is true, a diligent investor would not have to sift through mountains of material looking for the needle in a haystack, as plaintiffs' imply.  The *Los Angeles Times* – no obscure fish-wrap – had alerted diligent investors that evidence of Micron's price-fixing was submitted by Rambus

**Memorandum Decision and Order – Page 15**

during its FTC trial.  That clue provided a short-cut for diligent investors, who could quickly narrow their search through FTC files to a document prepared by Rambus summarizing its trial evidence, *i.e.*,  Rambus's proposed Findings.  Sure enough – the Radford e-mail was described in detail there.

Micron's intent to fix prices leaps out of Rambus's description of Radford's e-mail, even to the lay reader.  There is nothing disguised, subtle, or confusing about it; no reasonably diligent investor would have overlooked it.  Its importance is highlighted by plaintiffs' own discussion of it in their complaint.  *See Complaint at* ¶ 2.[4]

While this evidence would appear at first glance to satisfy the strict PSLRA pleading standards, and thus start the limitations period running, the Court cannot ignore the Circuit's standard of review on these issues.  As discussed above, the Circuit has held that when an issue turns on when a reasonable person should have discovered certain facts for statute of limitations purposes, the question is one of fact, generally for a jury to resolve.  *Nevada Power Co. v. Monsanto Co.*, 955 F.2d 1304, 1307 (9th Cir. 1992).  This has been described as an "extremely difficult burden . . . ."  *Nevada Power*, 955 F.3d at 1308.

---

[4]  Obviously, the Court is not holding that the e-mail is enough to establish price-fixing. The Court is simply accepting plaintiffs' own argument that the Radford e-mail helps them meet the PSLRA pleading standards.

Given this, the Court is concerned about finding – as a matter of law – that the *Los Angeles Times* article is the tipping point, warranting summary judgment. While the article may have led a diligent investor to the Radford e-mail, the article itself did not discuss that e-mail. Given the complete lack of discovery, the Court is not aware of the full context in which the article appeared. *Nevada Power* sets a very high standard that the Court cannot find is met at this point. For that reason, the Court will not grant summary judgment on *Berry's* second question concerning when plaintiffs should have discovered evidence sufficient to satisfy the PSLRA pleading standards.

**6.    Actual Notice**

Because this Circuit has not yet settled on a single test, district courts must apply both the actual notice and inquiry-plus-due diligence standards. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc*., 416 F.3d 940, 951 (9th Cir. 2005). If the actual discovery test requires examination of what plaintiffs knew, there are questions of fact because no discovery has been done.

However, *Berry* equates actual discovery with constructive discovery:

An actual discovery standard does not require determining precisely when each plaintiff actually knew of facts sufficient to make out a claim of fraud. Courts can impute knowledge of public information without inquiring into when, or whether, individual shareholders actually knew of the information in question."

**Memorandum Decision and Order – Page 17**

*Berry*, 175 F.3d at 703, n. 4.  This standard seems to equate the actual discovery standard with the due-diligence discovery standard discussed above.  Given that the Court has found questions of fact on the latter, it follows that similar questions of fact exist regarding the former.  Summary judgment will therefore be denied under this test as well.

**7.    PSLRA Pleading Sufficiency**

The Court has already discussed the strict pleading standard set forth in the PSLRA and will not repeat that discussion here.  That pleading standard is satisfied here.  It is a close question whether the Radford e-mail would have been enough to satisfy the standard, but the plaintiffs have identified a number of other e-mails, discovered later, to support their charges.

Moreover, plaintiffs have alleged specific false statements, identifying both the dates on which they were made and the persons who made them.  These allegations sufficiently plead falsity because they assert that Micron officials explained DRAM pricing as a product of market factors rather than price-fixing.

The complaint also alleges that Micron employees deliberately and knowingly engaged in a scheme to manipulate DRAM prices so that Micron could appear profitable to investors.  Those investors were allegedly injured when Micron's deliberate price-fixing scheme ceased and DRAM prices dropped.

**Memorandum Decision and Order – Page 18**

Plaintiffs must allege that Micron's fraud was conducted "in connection with" securities transactions.  *SEC v. Rana Research*, 8 F.3d 1358 (9th Cir. 1993). Plaintiffs meet that test here by alleging a close connection between DRAM prices and Micron's stock price, so that Micron's false statements and price-fixing scheme would artificially raise DRAM prices, attracting investors that would bid up the price of Micron shares.

The complaint further contains sufficient allegations of scienter.  The discussion of Micron's e-mails, in connection with Micron's own admissions regarding the DOJ investigation, raise a strong inference of scienter, or intent to defraud, assuming the allegations are true.

Micron argues that plaintiffs have failed to plead loss causation.  The Court disagrees.  Plaintiffs assert that Micron's false statements about market forces causing higher DRAM prices lured investors who were later damaged when Micron stock values fell after the price-fixing ceased.  Plaintiffs have further made specific allegations that the Micron stock movements were not due to volatility in the stock market.

On the whole, the Court finds that the strict PSLRA pleading standards are met in this case.

**8.** <u>**Motion to Amend**</u>

**Memorandum Decision and Order – Page 19**

Given the liberal provisions of Rule 15, especially at this early stage of the litigation, the Court will grant plaintiffs' motion to amend.

**9.**   **Conclusion**

The Court has denied Micron's motion to dismiss and granted plaintiffs' motion to amend.  Counsel are directed to contact the Court's clerk, LaDonna Garcia, for the purpose of scheduling a Case Management Conference to set various deadlines, including those for discovery and the filing of dispositive motions.

## ORDER

In accordance with the terms of the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion to dismiss (Docket No. 54), which the Court shall construe as a motion for summary judgment, is DENIED.

IT IS FURTHER ORDERED, that the motion to amend (Docket No. 59) is GRANTED.

IT IS FURTHER ORDERED, that counsel are directed to contact the Court's clerk LaDonna Garcia (208-334-9021) to set up a Case Management Conference.



DATED:  **February 21, 2007**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision and Order – Page 21**